# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

| | |
|---|---|
| John DOE,<br><br>     Plaintiff,<br><br>v.<br><br>THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA; THE UNIVERSITY OF GEORGIA; Jere Wade MOREHEAD, individually and as President of the University of Georgia; UNIVERSITY OF GEORGIA EQUAL OPPORTUNITY OFFICE; Eryn Janyce DAWKINS, individually and as Director of the University of Georgia Equal Opportunity Office; UNIVERSITY OF GEORGIA ATHLETIC ASSOCIATION; Edward McMillian TATE, individually and as Vice-Chancellor of Legal Affairs for the University of Georgia; and, C. Dean ALFORD, P.E., individually and as a Member of the Board of Regents of the University System of Georgia.<br><br>     Defendants. | Civil Action File No. 1:20-cv-04022-SDG |

## DEFENDANT DEAN ALFORD'S BRIEF IN SUPPORT OF HIS PRE-ANSWER MOTION TO DISMISS

COMES NOW Mr. Dean Alford, a Defendant in the above-styled action and

by his undersigned counsel of record moves this Court for dismissal as to all claims

made against this Defendant pursuant to Federal Rules of Civil Procedure Rules

12(b)(1) and (2) and 12(b)(6) based on the lack of personal and subject matter jurisdiction and Plaintiff's failure to state a claim for which relief may be granted, respectively. In support of his Motion, Defendant shows the following:

## STATEMENT OF FACTS AND PROCEEDINGS

For purposes of this motion only, Defendant accepts Plaintiff's well-plead facts in the complaint as true.

Plaintiff filed his 42 U.S.C. § 1983 action on September 29, 2020, alleging that his constitutional rights to free speech, due process, and equal protection were violated. [Doc. 1.] Plaintiff brings his constitutional claims against Defendant in his individual and official capacities as a former member of the Board of Regents of the University System of Georgia. [Doc. 1, p. 1 style of case, & p. 5 ¶ 17.] Plaintiff also raises a breach of contract claim. [Doc. 1 p. 9 ¶ 29 pp. 23-24, ¶¶ 94-99.] Plaintiff seeks compensatory and punitive damages along with a request for declaratory and injunctive relief. [Doc. 1 pp. 24-25, ¶¶ 100-104.]

At the time of the allegations in the complaint, Plaintiff was a student at the University of Georgia (UGA). [Doc. 1, p. 4 ¶ 9.] While attending the university, Plaintiff was on an "athletic team". [1] [Doc. 1, p. 5 ¶ 18.] On or about, September 29, 2018, Plaintiff was present on the UGA campus (in the stands of UGA's Sanford

_____

[1] Under information and belief, Plaintiff played on the UGA men's baseball team.

Stadium attending a football game as a "spectator"). [Doc. 1, p. 5 ¶ 18 & p. ¶ 38.]
During the game, Plaintiff publicly made a racial statement that could be interpreted
negatively or as being "hateful". [2] [Doc. 1, p. 10 ¶ 35; p. 11 ¶ 38; & p. 21 ¶ 84.]
Plaintiff later made a public apology for making the racially harmful statement.
[Doc. 1, p. 11 ¶ 38 & p. 21 ¶ 84.]

Based on the reports of Plaintiff's statement, on or about October 3, 2018,
Plaintiff was permanently released from his UGA athletic team by the UGA Georgia
Athletic Association. [3] [Doc. 1, p. 5, ¶ 18 & p. 6 ¶ 21.] The decision was made by
the UGA Georgia Athletic Association and the coach informed Plaintiff. [Doc. 1, p.
6 ¶ 21.] Plaintiff alleges that the UGA Georgia Athletic Association conducted an
investigation and had a meeting on the matter but that Plaintiff was not included in
the meeting or investigation. [Doc. 1, p. 5-6 ¶ 19.]

According to Plaintiff, on October 4, 2018, the University of Georgia Equal
Opportunity Office (EOO) suspended Plaintiff for the remainder of the fall 2018

---

[2] News reports quote Plaintiff as shouting out in the stadium stands on more than
one occasion "put that 'n word' in" the game – referring to one of the UGA Bulldogs'
African-American quarterbacks who was not being played.
https://www.washingtonpost.com/sports/2018/10/04/georgia-baseball-player-
dismissed-team-allegedly-using-racial-slur-during-bulldogs-football-game/
[3] The Athletic Association is a public corporation. O.C.G.A. § 20-3-78. The Board
of Regents provides general oversight over the association. [Exhibit 1 Bd. of Regents
Policy Manual Sec. 4.5.2. also available at https://www.usg.edu/policymanual.]

semester with eligibility to enroll in the university the following semester. [Doc. 1, 5 ¶ 18.] Next, on October 9, 2018, according to Plaintiff, this suspension was essentially reduced to allow Plaintiff to attend 2018 fall classes through remote attendance with the professor's permission. [Doc. 1, 5 ¶ 18.] However, Plaintiff contends it was not possible for him to enroll in all of his classes via remote attendance. Also, Plaintiff was prohibited from participating in any UGA Athletic units for the duration of his attendance at UGA. [Doc. 1, 5 ¶ 18.] Finally, Plaintiff allegedly was prohibited from attending any athletic events and prohibited from entering the UGA campus without prior permission from the EOO. [Doc. 1, 5 ¶ 18,]

Plaintiff alleges that the EOO also conducted a hearing and investigation. [Doc. 1, pp. 6-7 ¶ 23.] Plaintiff admits that he had five days' notice, although purportedly insufficient notice, for the hearing. [Doc. 1, pp. 6 ¶ 23.] Plaintiff presents no facts substantiating why he believes the notice was insufficient. The hearing officer was Eryn Dawkins who Plaintiff alleges lacked impartiality but, again, does not state facts substantiating the allegation of lack of impartiality. [Doc. 1, pp. 6-7 ¶ 23.] Plaintiff contends that the hearing was held five days following the alleged speech incident and he did not have sufficient time to prepare for the hearing. [Doc. 1, pp. 6-7 ¶ 23.] Without any supporting factual allegations, Plaintiff claims that the hearing officer, Eryn Dawkins, was not impartial and hostile, thereby, preventing

[4]

Plaintiff from "setting forth a defense" at the hearing. [Doc. 1, p. 7 ¶ 24.]

Next, Plaintiff appealed the hearing officer's decision to the UGA President, Jere Morehead. [Doc. 1, p. 7 ¶ 25.] On November 9, 2018, President Morehead upheld the EOO hearing officer's decision as well as the decision of the Athletic Association. [Doc. 1, p. 7 ¶ 25.] Plaintiff then appealed President Morehead's decision to the Board of Regents of the University System of Georgia. [Doc. 1, pp. 7-8 ¶ 26.] Plaintiff contends the Board (specifically members of the Board Defendant Alford and co-Defendant Tate) violated due process by not allowing Plaintiff's attorney to make an oral presentation or ask questions of the Board at the "hearing" when the Board voted on Plaintiff's appeal. [Doc. 1, pp. 7-8 ¶ 26.] According to Plaintiff, following review of Plaintiff's appeal, the Board voted to uphold the decision of the Athletic Association and the EOO. [Doc. 1, pp. 7-8 ¶ 26.]

Plaintiff alleges, again without any factual basis whatsoever, that other students and UGA "agents" had engaged in similar speech and had not been sanctioned. [Doc. 1, p. 7 ¶ 24.] Plaintiff fails to identify any similarly situated person or incident.

Plaintiff further alleges that Defendant Alford had a contract with Plaintiff based on the UGA student handbook and student athletic handbook. [Doc. 1, p. 9 ¶ 29 & p. p. 23 ¶¶ 94 & 95.] This so-called contract amounted to a promise to follow

[5]

the procedures established for student discipline and because Defendant did not follow the procedures for student discipline, Defendant Alford breached the contract causing Plaintiff injuries. [Doc. 1, p. 23 ¶ 95 & ¶ 96.]

## STANDARDS OF REVIEW

Challenges to jurisdiction under Rule 12(b)(1) and (2) may be presented with a facial attack on the complaint, under which the court determines whether Plaintiff sufficiently alleged subject-matter and personal jurisdiction. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009). When presented with a facial attack, the court evaluates the complaint the same as a Rule 12(b)(6) motion. Sinaltrainal, 578 F.3d at 1260. See also Fuller v. Carollo, Case No. 18-24190-CIV-MORENO/LOUIS, 2019 U.S. Dist. LEXIS 73635 (S.D. Fl. April 30, 2019). Rule 12 (b)(1) and (2) challenges to jurisdiction may also be presented as factual attacks, questioning "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings…are considered." Id. citing Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). No presumptive truthfulness attaches to the allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims. Id.

Plaintiff survives a 12(b)(6) motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level…."

Joseph v. Board of Regents, Case No. 1:20-cv-502-TCB, 2020 U.S. Dist. LEXIS 208570 (N.D. Ga. May 8, 2020) quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2006). While well-pleaded facts must be accepted as true, the Court need not accept as true the Plaintiff's legal conclusions, including those couched as factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). A plaintiff's complaint must provide more than labels and conclusions. Twombly, 550 U.S. at 555. Moreover, "unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of [plaintiff's] allegations." Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 & 1268 (11th Cir. 2009).

Even accepting the allegations as true here, the Complaint fails to state a claim for which relief may be granted against this Defendant and the pleading is barred for lack of personal and subject matter jurisdiction due to immunity.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Plaintiff's damage claims against Defendant Alford in his official capacity are barred by Eleventh Amendment and state sovereign immunity.

Eleventh Amendment Immunity bars Plaintiffs' § 1983 claims for damages against Defendant Alford in his official capacity as a member of the Georgia Board of Regents. The Eleventh Amendment bars suits against a state or one of its officials, absent a waiver by the state or a valid congressional override, when the state is the real party in interest. Kentucky v. Graham, 473 U.S. 159, 169 (1985); Pennhurst

State School & Hospital v. Halderman, 465 U.S. 89, 97-102 (1984). The Eleventh Amendment immunizes a state defendant from suit for monetary damages in his official capacity. See also Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989). The State of Georgia has not affirmatively waived its sovereign immunity in section 1983 cases. Georgia Constitution, Art. I, Sec. 2, Para. VIII. See Quern v. Jordan, 440 U.S. 332, 350 (1979); and Jones v. Buckner, 963 F. Supp. 2d 1267 (N.D. Ala. 2013). Therefore, based on the well-established legal precedent, Plaintiff's § 1983 damage claims against Defendant Alford in his official capacity should be dismissed.

## II.  Absolute quasi-judicial immunity bars Plaintiff's § 1983 damage claims against Defendant Alford in both his individual and official capacities.

Plaintiff sues Defendant Alford for his review of Plaintiff's student disciplinary appeal in his capacity as a member of the Board of Regents. Plaintiff's claims against the Board member for his part in the appellate-like quasi-judicial review of Plaintiff's appeal are barred by quasi-judicial immunity. Butz v. Economou, 438 U.S. 478 (1978). Quasi-judicial immunity extends to administrative bodies or executive officials who perform functions closely associated with the judicial process. Cleavinger v. Saxner, 474 U.S. 193, 200 (1985); Evans v. Ga. Peace Officer Standards & Training Council, Case No. 1:05-CV-2579-RLV, 2006 U.S. Dist. LEXIS 19415 (N.D. Ga. Mar. 29, 2006).

In Hicks v. Georgia State Bd. of Pharmacy, 553 F. Supp. 314 (N.D. Ga. 1982)

the court found that members of the Georgia State Board of Pharmacy were entitled to absolute quasi-judicial immunity for an alleged constitutional violation based on the Board's refusal to reinstate an individual's pharmacy license. In making this decision, the court examined the statutory responsibilities of the Board as well as the procedural safeguards accorded to persons subject to the agency's proceedings. The Hicks court concluded that the proceedings of the pharmacy board were sufficiently "judicial" because: 1) the action involved judicial-like procedures; and 2) the process included procedural safeguards accorded to persons subject to the proceedings – warranting a finding of absolute quasi-judicial immunity.

Similarly, in the present case, Plaintiff's disciplinary procedures were judicial-like. He had notice, a hearing before an EOO hearing officer, and the entry of findings of fact. [Doc. 1, pp. 6-7 ¶¶ 23 & 24.] Then Plaintiff appealed to the president of the university whose office affirmed the EOO's decision and Plaintiff then sought discretionary review of the president's decision by the Board of Regents that also affirmed the decision. [Doc. 1, pp. 7-8 ¶¶ 25 & 26.] This quasi-judicial agency process is set forth in the Board of Regents Policy Manual at 4.6.5.1 through 4.6.5.7 (Standards for Institutional Student Conduct Investigation and Disciplinary Proceedings for Georgia's universities) and 6.26 (Application for Discretionary Review by the Board of Regents). (Exhibit 1.). [These procedures were adopted by

the Board of Regents pursuant to its constitutional and statutory authority at Georgia Const. Art. VIII, Sect. IV, Para. I (b) and O.C.G.A. § 20-3-31(1).]

Identical to the <u>Hicks</u> decision, Plaintiff here could have appealed the decisions of the president, Athletic Association, and the Board of Regents to superior court pursuant to O.C.G.A. § 5-4-1 et seq. <u>See</u>, <u>e.g.</u>, <u>Wallace v. Bd of Regents of the University System</u>, 967 F. Supp. 1287 (S.D. Ga. 1997) (Plaintiff could seek review of the Board of Regents' administrative decision to the superior court pursuant to O.C.G.A. § 5-4-1); and <u>Coin-Op Solutions, LLC v. Norcross Co-055 Convenience, LLC</u>, Case No. A20A1550, 2020 Ga. App. LEXIS 656 (Ga. Ct. App. Nov. 3, 2020) (public corporation's decision such as the Georgia Lottery Association could be appealed pursuant to O.C.G.A. § 5-4-1). Thus, like the defendant agency in <u>Hicks</u>, the Board of Regents is entitled to absolute quasi-judicial immunity barring Plaintiff's constitutional claims for damages made pursuant to § 1983.

## III. Eleventh Amendment and state sovereign immunity bars Plaintiff's contract claims.

Plaintiff alleges a contract was created by the Board's policies and manual with every student. [Doc. 1, § 23 ¶94.] Because Georgia has not waived its Eleventh Amendment immunity a federal district court lacks jurisdiction to decide a student's contract claim against the Board of Regents (or its members who may only act in their official capacity to bind a state agency). <u>Barnes v. Zaccari</u>, 669 F.3d 1295 (11th

Cir. 2012). The test to determine if a state has waived its sovereign immunity "is a stringent one." Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999). A waiver of Eleventh Amendment immunity requires a specific and expressed permission for suits in federal court. Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299 (1990). Moreover, the Supreme Court has said that "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." Coll. Savings Bank, 527 U.S. at 676. Both the Georgia constitution and a state statute waives the state's sovereign immunity for actions *ex contractu* that are in writing. Ga. Const. Art. 1, § 2, Para. IX(c) and O.C.G.A. § 50-21-1(a). But neither provision expressly consents to suits in federal court. Absent express consent, Georgia has not waived its Eleventh Amendment immunity from suit in federal court for breach of contract. Barnes, 669 F.3d at 1308; Maynard v. Board of Regents, 342 F.3d 1281 (2003) (Because Georgia has not waived its Eleventh Amendment immunity, the district court lacked jurisdiction and should have dismissed plaintiff's contract claims on that basis), and Nicholl v. Board of Regents of the Univ. System of Ga., 706 Fed. Appx. 493 (11th Cir. 2017) (same).

In fact, Georgia expressly retains its Eleventh Amendment immunity from contract claims. The Georgia constitution states: "No waiver of sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the

state or its....officers, or employees by the United States Constitution." Ga. Const.

Art. 1, Sec. 2, Para. IX(f). Eleventh Amendment immunity is an immunity provided

by the U.S. Constitution. Additionally, the waiver in the Georgia Code states that

"venue with respect to any [breach of contract] action shall be proper in the Superior

Court of Fulton County, Georgia." O.C.G.A. § 50-21-1(b). Under Smith v. Reeves,

178 U.S. 436, 441-45 (1900), a state can consent to suit in its own courts without

consenting to suit in federal court. And that is what Georgia did when it enacted.

O.C.G.A. § 50-21-1.

Because Georgia has not waived its Eleventh Amendment immunity, the

Court lacks jurisdiction to decide Plaintiff's breach of contract claim against any of

the Defendants. Georgia also has not waived its sovereign immunity from suit in

federal court for such claims. Thus, the proper forum for Plaintiff's contract claims

is in Georgia state court, not federal court. Barnes, 669 F.3d at 1308-09.

**IV. Even if Plaintiff's constitutional claims are not barred by Eleventh Amendment or absolute quasi-judicial immunity, Plaintiff fails to state a claim for any constitutional violation.**

**A. Plaintiff failed to state a claim for a violation of his free speech rights.**

In the first instance, Plaintiff failed to state a free speech claim because he did

not identify the speech he engaged in that allegedly was protected – Plaintiff merely

alleges/admits that he said something at a public school sporting event on the UGA

campus pertaining to race that could be perceived as negative or hateful and that he later apologized for saying whatever it is he said. A plaintiff's complaint must provide more than labels and conclusions, he must allege facts substantiating his First Amendment claim. Twombly, 550 U.S. at 555. Accordingly, Plaintiff's free speech claim should be dismissed for failure to state a claim.

Moreover, "[t]he First Amendment rights of students… are not automatically coextensive with the rights of adults in other settings, and must be applied in light of special characteristics of the school environment." Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 266 (1988) (citations & quotation marks omitted). See also N.J. v. T.L.O., 469 U.S. 325, 340-42 (1985). Speech that is inappropriate in an educational setting is not protected speech, even if permitted elsewhere. Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1985). "Otherwise, the schools would be unduly constrained from fulfilling their role as a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and helping him adjust normally to his environment." Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 272 (1987) (internal quotation marks omitted).

As a matter of law, schools may prohibit speech that "intrudes upon…the rights of other students." Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1968). Students who may be injured by verbal assaults on the

basis of a core identifying characteristic such as race have a right to be free from such attacks while on school campuses. As <u>Tinker</u> clearly states, students have the right to "be secure and to be let alone." <u>Id</u>. at 508. Student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is…not immunized by the constitutional guarantee of free speech." <u>Id</u>. at 513. The "right to be let alone" is recognized by the Supreme Court as "the most comprehensive of rights and the most valued by civilized men." <u>Hill v. Colorado</u>, 530 U.S. 703 (2000) (internal quotation marks omitted). Being secure involves not only freedom from physical assaults but also from psychological attacks that cause young people to question their self-worth and their rightful place in society. Indeed, the "recognizable privacy interest in avoiding unwanted communication" is perhaps most important "when persons are powerless to avoid it." <u>Id</u>. at 716 (internal quotation marks omitted). Although name-calling is ordinarily protected outside the school context, "students cannot hide behind the First Amendment to protect their right to abuse and intimidate other students at school." <u>Sypniewski v. Warren Hills Reg. Bd. of Educ.</u>, 307 F.3d 243, 264 (3rd Cir. 2002). Speech that insults students who are members of minority groups that have historically been oppressed, subjected to verbal and physical abuse, and made to feel inferior, serves to injure and intimidate them, as well as to damage their sense of security and interfere with

their opportunity to learn.

Those who administer public educational institutions need not tolerate verbal assaults that may destroy the self-esteem of vulnerable students and interfere with their educational development. Muller v. Jefferson Lighthouse School, 98 F.3d 1530, 1540 (7th Cir. 1996). To the contrary, the Board of Regents and its members had a valid basis, as a matter of law, for disciplining Plaintiff whose speech was admittedly stated publicly on campus and that demeaned minority students. For these reasons, Plaintiff failed to state a claim for a constitutional free speech violation.

### B. Plaintiff failed to state a claim for an Equal Protection violation.

The "threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated, since the Equal Protection Clause requires that 'persons similarly situated…be treated alike.'" S&M Brands, Inc. v. Ga. ex rel. Car, 925 F.3d 1198, 1203 (11th Cir. 2019) (quoting City of Cleburne v. City of Cleburne Living Center, 473 U.S. 432, 439 (1985); Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

"To plead a plausible claim that [Defendant Alford] violated his right to equal protection, [Plaintiff] had to allege that…he is similarly situated with other persons

who received more favorable treatment…." <u>Jones v. Ray</u>, 279 F.3d 944, 946-47 (11th Cir. 2001) (internal quotation marks omitted). If a plaintiff fails to identify a comparator, much less a similarly situated comparator, then Plaintiff fails to state a claim. <u>Mann v. Joseph</u>, 805 Fed. Appx. 779 (11th Cir. 2020). Like the plaintiff in <u>Mann</u>, Plaintiff here failed to identify any person who made similar or the same statements in a similar or same manner. Absent such factual allegations, Plaintiff failed to state a claim of an equal protection violation.

**C.  <u>Plaintiff failed to state a claim for a violation of substantive due process</u>.**

The Due Process Clause protects against deprivations of fundamental rights such as "life, liberty, or property". U.S. Const. Amend. XIV; <u>Whitaker v. Board of Regents of the University System of Ga.</u>, Case No. CV 118-141, 2020 U.S. Dist. LEXIS 153263 (S.D. Ga. Aug. 24, 2020). Due Process protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty." <u>McKinney v. Pate</u>, 20 F.3d 1550, 1556 (11th Cir. 1994). To establish substantive due process, a plaintiff must show that he was deprived of a federal right. <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1303 (11th Cir. 2001). Just because a plaintiff suffers a loss, does not mean the lost interest is constitutionally protected. <u>See</u>, <u>e.g.</u>, <u>Silva v. Bieluch</u>, 351 F.3d 1045, 1047-48 (11th Cir. 2003) (demotion did not implicate procedural due process because plaintiff did not have a protected liberty or property

interest in their job position); <u>Jones v. Buckner</u>, 963 F. Supp. 2d 1267 (N.D. Ala. 2013) (damage to reputation does not amount to a deprivation of "life, liberty, or property"). The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." <u>Washington v. Glucksberg</u>, 521 U.S. 702 (1997). "[T]he 'liberty' specially protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." <u>Id</u>. at 720. There is no fundamental right to continued enrollment in a university or a university's athletic program. <u>Whitaker</u>, 2020 U.S. Dist. LEXIS 153263.

Plaintiff here contends he was denied various privileges not fundamental rights. Specifically, he alleges the discipline imposed (including changing him from in-person to remote classes for one semester, removal from an athletic team, and prohibition from attending sporting events) caused him emotional distress, humiliation, and embarrassment as well as loss of employment opportunities and athletic playing opportunities. [Doc. 1, p. 9 ¶¶ 30-31.] These interests are not the type that warrant heightened constitutional protection under substantive Due Process. As a matter of law, Plaintiff's due process claim against Defendant Alford fails because "students at a public university do not have a fundamental right to

continued enrollment." <u>Doe v. Valencia College</u>, 903 F.3d 1220, 1236, 1236 n.13 (11th Cir. 2018) (citing, among others, <u>Plyler v. Doe</u>, 457 U.S. 202, 221 (1982)) (affirming court's decision that the plaintiff failed to state a substantive due process claim by arguing his right to continued enrollment was violated "when the school acted in an arbitrary and capricious manner during his disciplinary proceedings"). Therefore, for these reasons, Plaintiff fails to state a substantive due process claim.

### D. **Plaintiff failed to state a claim for a violation of procedural due process.**

A procedural due process claim is based on the theory that a state actor cannot deprive a person of a fundamental right without fair and adequate procedures. Even assuming Plaintiff had alleged a fundamental interest in attending the university and a UGA athletic program (which, as discussed above, he did not) his claims for a violation of procedural due process fails. A procedural due process violation does not occur until the state fails to provide an adequate remedy. <u>Wallace v. Bd. of Regents of the Univ. System</u>, 967 F. Supp. 1287 (1997) citing <u>Merritt v. Brantley</u>, 936 F. Supp. 988, 991 (S.D. Ga. 1996). The state may cure a procedural deprivation by providing a later procedural remedy. <u>McKinney v. Pate</u>, 20 F.3d 1550, 1557 (11th Cir.) (en banc), cert. denied, 115 S. Ct. 898 (1994). Here, Plaintiff could have sought review of these disciplinary decisions by filing a petition for a writ of certiorari in the Superior Court within thirty days. O.C.G.A. § 5-4-1. <u>Wallace</u>, 967 F. Supp. 1293.

Plaintiff did not pursue this remedy, and has not alleged that this remedy was inadequate. Thus, even if Plaintiff had a fundamental interest infringed by Defendants, he had available adequate state remedies that he did not avail himself of. Merritt, 936 F. Supp. at 991. [4] Plaintiff had available adequate state remedies as a matter of law, and, thus, cannot state a claim for a procedural due process violation.

## V. Plaintiff's injunctive relief claims are barred by Eleventh Amendment and sovereign immunity, thereby divesting the Court of jurisdiction.

As a preliminary matter, Plaintiff sues Defendant Alford in his individual and official capacities for injunctive and declaratory relief. However, "Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." Jones v. Buckner, 963 F.Supp.2d 1267, 1281 (N.D. Ala. 2013) quoting Brown v. Montoya, 662 F.3d 1152, 1161 n. 5 (10th Cir. 2011).

Plaintiff's request for injunctive and declaratory relief fail first because, as

---

[4] Plaintiff also could have availed himself of the adequate post-deprivation remedies provided by the Georgia Tort Claims Act (GTA) for the alleged unauthorized acts of Defendant and failed to do so. O.C.G.A. 50-21-20 et seq.; McCall v. DHR, 176 F.Supp.2d 1355 (M.D. Ga. 2001) (Where an individual's liberty interest is violated by a random, unauthorized act, the GTA provides an adequate post-deprivation remedy precluding a due process claim.). See also Parratt v. Taylor, 451 U.S. 527, 538–41 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327 (1986); and, Hudson v. Palmer, 468 U.S. 517, 530–33 (1984).

explained above, he fails as a matter of law to state an underlying constitutional violation and Plaintiff's constitutional claims are subject to dismissal under Fed. R. Civ. P. 12(b)(6). See, e.g., Maddox v. Coogler, 224 Ga. 806, 808-809 (1968).

However, even if Plaintiff stated a constitutional claim, his request for injunctive relief is barred by Eleventh Amendment immunity. The doctrine of Ex parte Young, 209 U.S. 123 (1908) provides for a limited and well-established exception to official immunity. The Ex Parte Young doctrine allows suits against state officials "seeking prospective equitable relief to end continuing violations of federal law." Summit Medical Associations, P.C. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 1999) (emphasis removed). However, a plaintiff may not "use the doctrine to adjudicate the legality of past conduct." Id. at 1337. See also Nicholl v. Olens, Case No. 1:17-CV-4518-AT, 2018 U.S. Dist. LEXIS 233487 (N.D. Ga. May 8, 2018).

The relief sought in this case for injunctive relief seeks changes for past actions and not prospective injunctive relief. [Doc. pp. 24-25, ¶¶ 101-104.] Plaintiff's "injunctive relief" seeks reversal of the university's disciplinary action against him so that he will be allowed to return to classes and the UGA Athletic team, as well as expungement of his record. Thus, although Plaintiff seeks injunctive and  declaratory relief, he is essentially challenging "the legality of past conduct." Summit Medical Associations, 180 F.3d at 1337. Plaintiff's complaint describes the

allegedly unconstitutional conduct in the past tense as a discrete event (Plaintiff's disciplinary action allegedly taken in violation of Plaintiff's First Amendment rights). Plaintiff cannot transform the one time disciplinary action into ongoing conduct merely by pointing out that no one has reversed the disciplinary decision. Fedorov v. Board of Regents for the University of Ga., 194 F.Supp.2d 1378, 1387 (S.D. Ga. 2002) ("Simply because the remedy will occur in the future, does not transform it into 'prospective' relief. The term, 'prospective relief' refers to the ongoing or future threat of harm, not relief.") Here, there is no ongoing alleged violation of federal constitutional law. Accordingly, Plaintiff cannot overcome Defendant Alford's Eleventh Amendment immunity and 12(b)(1) motion to dismiss Plaintiff's request for injunctive relief. Nicholl, 2018 U.S. Dist. LEXIS 233487.

Moreover, in Georgia, sovereign immunity extends to suits for injunctive relief. Georgia Dept. of Natural Resources v. Sustainable Coast, 294 Ga. 593, 603 (2014). No waiver of state sovereign immunity applies to discretionary disciplinary decisions of officials. Sustainable Coast, 294 Ga. at 603. Sovereign immunity bars a suit against a state officer for injunctive relief against official acts that were alleged to be unconstitutional. See, e.g., Maddox v. Coogler, 224 Ga. 806, 808-809 (1968).

## VI. Plaintiff's request for declaratory relief is barred by Eleventh Amendment and sovereign immunity.

Plaintiff seeks a declaration that Defendants violated his rights. Like

injunctive relief actions, declaratory judgment actions filed against state officials are essentially suits against the state – official capacity suits. <u>Jones v. Buckner</u>, 963 F.Supp.2d at 1281. Thus, declaratory relief also is barred by sovereign immunity. <u>Jones v. Buckner</u>, 963 F.Supp. 2d 1267 (N.D. Ala. 2013). The Georgia Courts have found that sovereign immunity applies to a state official's discretionary decisions absent a specific waiver. <u>Olvera v. University System of Georgia's Board of Regents</u>, 298 Ga. 425 (2016) (the lower court properly dismissed a foreign college students' declaratory judgment action seeking instate tuition because the suit was barred by sovereign immunity and waiver did not apply).

In addition, although <u>Ex Parte Young</u> allows declaratory relief, it does not apply when the relief pertains only to past violations of federal law. <u>Green v. Mansour</u>, 474 U.S. 64, 73 (1985) (holding that sovereign immunity barred a claim for declaratory relief because issuance of such a judgment would have had "much the same effect as a full-fledged award of damages or restitution by the federal court"); <u>see</u> <u>also</u> <u>Summit Medical Assocs., P.C. v. Pryor</u>, 180 F.3d 1326, 1337 (11th Cir. 1999) ("a plaintiff may not use the [Ex parte Young] doctrine to adjudicate the legality of past conduct"). The issuance of a declaratory judgment against Defendant in declaring that, by his past actions, he has exceeded his authority and violated federal law would serve no purpose other than to validate or authorize an award of

monetary damages. Accordingly, Plaintiff's request to declare a violation of his rights should be dismissed because: 1) the claim is barred by Eleventh Amendment and sovereign immunity; and 2) Plaintiff only seeks relief for past actions.

## VII. Plaintiff's damage claims against Defendant in his individual capacity are barred by qualified immunity.

Qualified immunity shields governmental officials executing discretionary responsibilities from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Courson v. McMillian, 939 F.2d 1479, 1486 (11th Cir. 1991) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See also Denno ex rel. Denno v. School Board, 218 F.3d 1267 (11th Cir. 2000). "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Lassiter v. Ala. A&M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). The qualified immunity standard sets up a bright-line test that is a powerful constraint on causes of action under § 1983. Whether the instant complaint alleges a violation of a clearly-established right is a question of law for the Court to decide as early in the litigation process as possible. Denno, 218 F.3d at 1270.

It cannot reasonably be disputed that Defendant Alford exercised his

discretion when upholding Plaintiff's student disciplinary appeal to the Board of Regents and, thus, the burden to establish applicable clearly establish law demonstrating a constitutional violation is on Plaintiff. Courson, 939 F.2d 1486-1488. This, Plaintiff cannot do. No clearly established law suggests that any of the Defendants could not discipline a student who shouts offensive racial language at an on-campus sporting event. Indeed, the caselaw suggests the opposite. Denno, 218 F.3d at 1271 (surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse).

The Court should not conclude that Defendant Alford's actions in affirming a student's discipline for making offensive racial comments publicly on campus was "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." Lassiter, 28 F.3d at 1149. Indeed, Plaintiff can point to no case law that makes such a conclusion. See also Denno, 218 F.3d 1274-1276. Accordingly, Plaintiff's constitutional damage claims against this Defendant in his individual capacity are barred by qualified immunity.

## CONCLUSION

Based on the foregoing, Defendant Alford Dean respectfully requests the Court dismiss this action as made against this Defendant.

Respectfully submitted this 21st day of January, 2021.

SATCHER & MCGOVERN LLC

/s/ Annarita L. McGovern
ANNARITA L. MCGOVERN
Georgia Bar No. 098141

/s/ Terry L. Long
TERRY L. LONG
Georgia Bar No. 457460

*Counsel for Defendant Mr. Dean Alford*

288 South Main Street
Suite 100
Alpharetta, Georgia 30009
Office: (770) 765-0225
Direct: (770) 847-7280
amcgovern@satchermcgovernlaw.com
tlong@satchermcgovernlaw.com

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point Times New Roman type face.

This the 21st day of January, 2021.

**SATCHER & MCGOVERN LLC**

/s/ Annarita L. McGovern
ANNARITA L. MCGOVERN
Georgia Bar No. 098141

***Counsel for Defendant Mr. Dean Alford***

288 South Main Street
Suite 100
Alpharetta, Georgia 30009
Office: (770) 765-0225
Direct: (770) 847-7280
amcgovern@satchermcgovernlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I served a true and correct copy of the within and foregoing **DEFENDANT DEAN ALFORD'S BRIEF IN SUPPORT OF HIS PRE-ANSWER MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record, as follows:

Dorothy Spinelli
Dorothy Spinelli, PC
1105 Town Blvd., #2506
Brookhaven, GA 30319
dorothyspinelliesq@gmail.com
*Counsel for Plaintiff*

Ellen Cusimano
Assistant Attorney General
Chris Carr
Attorney General
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334
ECusimano@LAW.GA.Gov
*Counsel for Co-Defendants*

This 21st day of January, 2021.

**SATCHER & MCGOVERN LLC**

/s/ Annarita L. McGovern
ANNARITA L. MCGOVERN
Georgia Bar No. 098141
*Counsel for Defendant Mr. Dean Alford*

288 South Main Street
Suite 100
Alpharetta, Georgia 30009
Office: (770) 765-0225
Direct: (770) 847-7280
amcgovern@satchermcgovernlaw.com

# EXHIBIT 1



## 4.5.2 Board Oversight

The Board of Regents provides oversight and broad policy guidelines for the operation and budget activities of intercollegiate athletics programs in a manner consistent with the operation of other USG units.



# 4.6.5.1 Reports of Student Misconduct

Institutions must provide clear notice to students and other campus community members as to how to file complaints of misconduct.

Complaints to the appropriate department and/or person(s) should include as much information as possible – such as: (1) the type of misconduct alleged; (2) the name and contact information of the individual(s) accused of misconduct; (3) the date(s), time(s), and place(s) of the misconduct; (4) the

name(s) and contact information of any individual(s) with knowledge of the incident; (5) whether any tangible evidence has been preserved; and (6) whether a criminal complaint has been made.

Information from complaints may be shared as necessary to investigate and to resolve the alleged misconduct. Complaints shall be investigated and resolved as outlined below. The need to issue a broader warning to the community in compliance with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") shall be assessed in compliance with federal law.

Where appropriate, Complainants may file a law enforcement report as well as an institutional report, but are not required to file both.

**Confidentiality:**

Where a Complainant (where applicable) requests that their identity be withheld or the allegation(s) not be investigated, the institution should consider whether or not such request(s) can be honored while still promoting a safe and nondiscriminatory environment for the institution and conducting an effective review of the allegations. The institution should inform the requesting party that the institution cannot guarantee confidentiality and that even granting requests for confidentiality shall not prevent the institution from reporting information or statistical data as required by law, including the Clery Act.

**Retaliation:**

Anyone who has made a report or complaint, provided information, assisted, participated or refused to participate in any investigation or resolution under applicable Board or institution policy shall not be subjected to retaliation. Anyone who believes they have been subjected to retaliation should immediately contact the appropriate department or individual(s) for that institution. Any person found to have engaged in retaliation shall be subject to disciplinary action, pursuant to the institution's policy.

**False Complaints/Statements:**

Individuals are prohibited from knowingly giving false statements to an institution official. Any person found to have knowingly submitted false complaints, accusations, or statements, including during a hearing, in violation of applicable Board or institution policy shall be subject to appropriate disciplinary

action (up to and including suspension or expulsion) and adjudicated pursuant to the institution's policy.

**Amnesty:**

Students should be encouraged to come forward and report violations of the law and/or student code of conduct notwithstanding their choice to consume alcohol or drugs. Information reported by a student during the conduct process concerning their consumption of drugs or alcohol will not be voluntarily reported to law enforcement; nor will information that the individual provides be used against the individual for purposes of conduct violations. Nevertheless, these students may be required to meet with staff members regarding the incident and may be required to participate in appropriate educational program(s). The required participation in an educational program under this amnesty procedure will not be considered a sanction. Nothing in this amnesty procedure shall prevent a university staff member who is otherwise obligated by law (the Clery Act) to report information or statistical data as required.

# 4.6.5.2 Process for Investigating and Resolving Disputed Reports

**Jurisdiction:**

Each institution shall take necessary and appropriate action to protect the safety and well-being of its community. Accordingly, student conduct should be addressed when such acts occur on institution property, at institution-sponsored or affiliated events, or otherwise violate the institution's student conduct policies, regardless as to where such conduct occurs. If the student has admitted responsibility and has voluntarily decided to participate in the informal process, the procedures outlined in this section will not apply.

**Access to Advisors:**

The Respondent and Complainant (where applicable), as parties to these proceedings, shall have the right to have an advisor (who may or may not be an attorney) of the party's choosing, and at their own expense, for the express purpose of providing advice and counsel. The advisor may be present during meetings and proceedings during the investigatory and/or resolution process at which his or her advisee is present. The advisor may advise their advisee in any manner, including providing

questions, suggestions, and guidance on responses to any questions posed to the advisee, but shall not participate directly during the investigation or hearing process.

**Initial Evaluation of Student Conduct Reports:**

Regardless of how an institution becomes aware of alleged misconduct, the institution shall ensure a prompt, fair, and impartial review and resolution of complaints alleging student misconduct. Where a report of student misconduct has been made to the appropriate department and/or person, the institution shall review the complaint to determine whether the allegation(s) describes conduct in violation of the institution's policies and/or code of conduct. If the reported conduct would not be a violation of the institution's policies and/or code of conduct, even if true, then the report should be dismissed. Otherwise, a prompt, thorough, and impartial investigation, and review shall be conducted into each complaint received to determine whether charges against the Respondent should be brought.

Any report that involves allegation(s) of conduct that could lead to the suspension or expulsion of the Respondent(s) in an initial violation must be promptly reported to the System Director of Equity & Investigations ("System Director") by the institution. The System Director will work with the institution to determine whether any interim measure(s) are necessary, to assign an investigator and may collaboratively supervise the investigation with the appropriate institution professional (e.g., the Title IX Coordinator, Dean of Students). If an allegation is not initially identified as one that could lead to suspension or expulsion of the Respondent(s), but facts arise during the course of the investigation that would require notice to the System Director, then the institution shall report that case to the System Director or their designee prior to proceeding.

**Interim Measures**

Interim measures may be implemented by the institution at any point after the institution becomes aware of the alleged student misconduct and should be designed to protect any student or other individual in the USG community. To the extent interim measures are imposed, they should minimize the burden on both the Complaint (where applicable) and the Respondent, where feasible. Interim measures may include, but are not limited to:

1. Change of housing assignment;
2. Issuance of a "no contact" directive;
3. Restrictions or bars to entering certain institution property;
4. Changes to academic or employment arrangements, schedules, or supervision;

5. Interim suspension; and

6. Other measures designed to promote the safety and well-being of the parties and the institution's community.

An interim suspension should only occur where necessary to maintain safety and should be limited to those situations where the respondent poses a serious and immediate danger or threat to persons or property. In making such an assessment, the institution should consider the existence of a significant risk to the health or safety of the Complainant (where applicable) or the campus community; the nature, duration, and severity of the risk; the probability of potential injury; and whether less restrictive means can be used to significantly mitigate the risk.

Before an interim suspension is issued, the institution must make all reasonable efforts to give the Respondent the opportunity to be heard on whether the Respondent's presence on campus poses a danger. If an interim suspension is issued, the terms of the suspension take effect immediately. The Respondent shall receive notice of the interim suspension and the opportunity to respond to the interim suspension.

Within three business days of receiving a challenge the institution will determine whether the interim suspension should continue.

**Investigation**

Throughout any investigation and resolution proceedings, a party shall receive written notice of the alleged misconduct, shall be provided an opportunity to respond, and shall be allowed to remain silent or otherwise not participate in or during the investigation and resolution process without an adverse inference resulting. If a party chooses to remain silent or otherwise not participate in an investigation, the investigation may still proceed and policy charges may still result and be resolved. Timely and equal access to information that will be used during the investigation will be provided to the Complainant (where applicable) and Respondent.

Where the potential sanctions for the alleged misconduct may involve a suspension or expulsion (even if such sanctions were to be held "in abeyance," such as probationary suspension or expulsion) the institution's investigation and resolution procedures must provide the additional minimal safeguards outlined below.

1. The Complainant (where applicable) and Respondent shall be provided with written notice of the complaint/allegations, pending investigation, possible charges, possible sanctions, and

available support services. The notice should also include the identity of any investigator(s) involved. Notice should be provided via institution email to the address on file.

2. Upon receipt of the written notice, the Respondent shall have at least three business days to respond in writing. In that response, the Respondent shall have the right to admit or to deny the allegations, and to set forth a defense with facts, witnesses, and supporting materials. A non-response will be considered a general denial of the alleged misconduct. Any Complainant (where applicable) shall also be provided three business days to respond to or to supplement the notice.

3. If the Respondent admits responsibility, the process may proceed to the sanctioning phase or may be informally resolved, if appropriate.

4. If at any point the investigator determines there is insufficient evidence to support a charge or to warrant further consideration of discipline, then the complaint should be dismissed.

5. An investigator shall conduct a thorough investigation and should retain written notes and/or obtain written or recorded statements from each interview. The investigator shall also keep a record of any party's proffered witnesses not interviewed, along with a brief, written explanation of why the witnesses were not interviewed.

6. The initial investigation report shall be provided to the Respondent and the Complainant (where applicable). This report should clearly indicate any resulting charges (or alternatively, a determination of no charges), as well as the facts and evidence in support thereof, witness statements, and possible sanctions. For purposes of this Policy, a charge is not a finding of responsibility, but indicates that there is sufficient evidence to warrant further consideration and adjudication.

7. The final investigation report should be provided to the misconduct panel or hearing officer for consideration in adjudicating the charges brought against the Respondent. A copy shall also be provided to the respondent and Complainant (where applicable) before any hearing. The investigator may testify as a witness regarding the investigation and findings, but shall otherwise have no part in the hearing process and shall not attempt to otherwise influence the proceedings outside of providing testimony during the hearing.

**Resolution/Hearing**

In no case shall a hearing to resolve charge(s) of student misconduct take place before the investigative report has been finalized.

Where the Respondent indicates that they contest the charges, the matter shall be set for a hearing and once the investigative report has been finalized and copies provided to the Respondent and

Complainant (where applicable); however, the Complainant (where applicable) and Respondent may have the option of selecting informal resolution as a possible resolution in certain student misconduct cases where they mutually agree, except where deemed inappropriate by the Vice President for Student Affairs (or their designee) or the System Director.

Where a case is not resolved through informal resolution or informal resolution is not available due to the nature of the charges, the Respondent shall have the option of having the charges heard either by an administrator (Hearing Officer) or a Hearing Panel. If an administrative hearing is requested, the Respondent shall use their discretion to determine whether the case should be heard by a Hearing Panel. Notice of the date, time, and location of the hearing shall be provided to the Respondent and Complainant (where applicable) at least five business days prior to the hearing. Notice shall be provided via institution email where applicable. Hearings shall be conducted in person or via conferencing technology as reasonably available. Additionally, the following standards will apply to any such hearing:

The Respondent and Complainant (where applicable) shall have the right to present witnesses and evidence to the hearing officer or panel. Witness testimony, if provided, shall pertain to knowledge and facts directly associated with the case being heard. The Respondent and Complainant (where applicable) shall have the right to confront any witnesses, including the other party, by submitting written questions to the Hearing Officer or Hearing Panel for consideration. Advisors may actively assist in drafting questions. The Hearing Officer or Hearing Panel shall ask the questions as written and will limit questions only if they are unrelated to determining the veracity of the charge leveled against the Respondent(s). In any event, the Hearing Officer or Hearing Panel shall err on the side of asking all submitted questions and must document the reason for not asking any particular questions.

1. Where the Hearing Officer or Hearing Panel determines that a party or witness is unavailable and unable to be present due to extenuating circumstances, the Hearing Officer or Hearing Panel may establish special procedures for providing testimony from a separate location. In doing so, the Hearing Officer or Hearing Panel must determine whether there is a valid basis for the unavailability, ensure proper sequestration in a manner that ensures testimony has not been tainted, and make a determination that such an arrangement will not unfairly disadvantage any party. Should it be reasonably believed that a party or witness who is not physically present has presented tainted testimony, the Hearing Officer or Hearing Panel will disregard or discount the testimony.

2. Formal judicial rules of evidence do not apply to the investigatory or resolution process.

3. The standard of review shall be a preponderance of the evidence.

4. Institutions should maintain documentation of the proceedings, which may include written findings of fact, transcripts, audio recordings, and/or video recordings.

5. Following a hearing, both the Respondent and Complainant (where applicable) shall be simultaneously provided a written decision via institution email (where applicable) of the outcome and any resulting sanctions. The decision should include details on how to appeal, as outlined below. Additionally, the written decision must summarize the evidence relied on in support of the outcome and the rationale for the resulting sanction. The same form will be completed, regardless of whether the student opts for a hearing panel or an administrative proceeding.

# 4.6.5.3 Reports of Sexual Misconduct

**Initial Evaluation of Sexual Misconduct Reports:**

Upon notice of the alleged Sexual Misconduct the institution's Title IX Coordinator ("Coordinator") will assess whether a formal investigation, informal resolution, or dismissal would be appropriate. In making this determination, the Coordinator will assess whether the allegation(s), if true, would rise to the level of prohibited conduct, whether a Formal Complaint must be filed, whether an investigation is appropriate in light of the circumstances, whether the parties prefer an informal resolution, and whether any safety concerns exist for the campus community. The need to issue a broader warning to the community in compliance with the Clery Act shall be assessed in compliance with federal law.

**Confidentiality:**

Where a Complainant requests that their identity be withheld or the allegation(s) not be investigated, the Coordinator should consider whether or not such request(s) can be honored in a manner consistent with the institution's obligations to promote a safe and nondiscriminatory environment. The institution should inform the Complainant that the institution cannot guarantee confidentiality. Honoring a Complainant's request for confidentiality shall not prevent the institution from reporting information or statistical data as required by law, including the Clery Act.

**Retaliation:**

Anyone who has made a report or complaint, provided information, assisted, participated, or refused to participate in any manner in the Sexual Misconduct process, shall not be subjected to retaliation. Anyone who believes that they have been subjected to retaliation should immediately contact the

Coordinator or their designee. Any person found to have engaged in retaliation shall be subject to disciplinary action.

**False Complaints/Statements:**

Individuals are prohibited from knowingly making false statements or knowingly submitting false information to a system or institution official. Any person found to have knowingly submitted false complaints, accusations, or statements, including during a hearing, shall be subject to appropriate disciplinary action (up to and including suspension or expulsion) under the appropriate institutional process.

**Amnesty:**

Students should be encouraged to come forward and to report Sexual Misconduct notwithstanding their choice to consume alcohol or to use drugs. Information reported by a student during the Sexual Misconduct process concerning the consumption of drugs or alcohol will not be used against the particular student in a disciplinary proceeding or voluntarily reported to law enforcement; however, students may be provided with resources on drug and alcohol counseling and/or education, as appropriate. Nevertheless, these students may be required to meet with staff members regarding the incident and may be required to participate in appropriate educational program(s). The required participation in an educational program under this amnesty procedure will not be considered a sanction. Nothing in this amnesty provision shall prevent an institution staff member who is otherwise obligated by law (the Clery Act) to report information or statistical data as required.

**Jurisdiction:**

Each institution shall take necessary and appropriate action to promote the safety and well-being of its community. Accordingly, Sexual Misconduct should be addressed when such acts occur on institution property, at institution-sponsored or affiliated events, or otherwise violates the institution's student conduct policies, regardless as to where such conduct occurs.

**Access to Advisors:**

1. **For Formal Title IX Complaints:** Both the Complainant and the Respondent, as parties to the matter, shall have the opportunity to use an advisor (who may or may not be an attorney) of the party's choosing. The advisor may accompany the party to all meetings and may provide advice and counsel to their respective party throughout the Sexual Misconduct process,

including providing questions, suggestions and guidance to the party, but may not actively participate in the process except to conduct cross-examination at the hearing as outlined in the Resolution/Hearing section below. If a party chooses not to use an advisor during the investigation, the institution will provide an advisor for the purpose of conducting cross-examination on behalf of the relevant party. All communication during the Sexual Misconduct process will be between the institution and the party and not the advisor. The institution will copy the party's advisor prior to the finalization of the investigation report when the institution provides the parties the right to inspect and review directly related information gathered during the investigation. With the party's permission, the advisor may be copied on all communications.

2. **For Non-Title IX Sexual Misconduct Complaints:** Both the Complainant and the Respondent, as parties to the matter, shall have the opportunity to use an advisor (who may or may not be an attorney) of the party's choosing at the party's own expense. The advisor may accompany the party to all meetings and may provide advice and counsel to their respective party throughout the Sexual Misconduct process but may not actively participate in the process. All communication during the Sexual Misconduct process will be between the institution and the party and not the advisor. With the party's permission, the advisor may be copied on all communications.

**Interim Measures:**

Interim measures may be implemented at any point after the institution becomes aware of an allegation of Sexual Misconduct and should be designed to protect any student or other individual in the USG community. Such measures are designed to restore or preserve equal access to the education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter Sexual Misconduct and retaliation. Interim measures must be implemented consistent with the provisions in applicable Board and institutional policies and procedures.

An interim suspension should only occur where necessary to promote safety and should be limited to those situations where the Respondent poses a serious and immediate danger or threat to persons or property. In making such an assessment, the institution should consider the existence of a significant risk to the health or safety of the Complainant or the campus community; the nature, duration, and severity of the risk; the probability of potential injury; and whether less restrictive means can be used to significantly mitigate the risk.

Before an interim suspension is issued, the institution must make reasonable efforts to give the Respondent the opportunity to be heard on whether the Respondent's presence on campus poses a danger. If an interim suspension is issued, the terms of the interim suspension take effect immediately. The Respondent shall receive notice of the interim suspension and the opportunity to respond to the interim suspension.

Within three business days of receiving a challenge the institution will determine whether the interim suspension should continue.

# 4.6.5.4 Process for Investigating and Resolving Sexual Misconduct Reports

**Investigation**

Throughout any investigation and resolution proceeding, a party shall receive written notice of the alleged Sexual Misconduct, shall be provided an opportunity to respond, and shall be allowed the right to remain silent or otherwise not participate in or during the investigation and resolution process without an adverse inference resulting. If a party chooses to remain silent or otherwise not participate in the investigation or resolution process, the investigation and resolution process may still proceed, and policy violations may result.

Until a final determination of responsibility, the Respondent is presumed to have not violated the Sexual Misconduct Policy. Prior to the finalization of the investigation report, timely and equal access to information directly related to the allegations that has been gathered during the investigation and may be used at the hearing will be provided to the Complaint, the Respondent, and a party's advisor (where applicable).

Formal judicial rules of evidence do not apply to the investigation process, additionally the standard of review throughout the Sexual Misconduct process is a preponderance of the evidence.

1. The parties shall be provided with written notice of the: report/allegations with sufficient details, pending investigation, possible charges, possible sanctions, available support services and interim measures, and other rights under applicable institutional policies. For the purposes of this provision sufficient details include the identities of the parties involved, if known, the conduct allegedly constituting Sexual Misconduct, and the date and location of the alleged incident, if known. This information will be supplemented as necessary with relevant evidence

collected during the investigation. The notice should also include the identity of any investigator(s) involved. Notice should be provided via institution email to the party's institution email.

2. Upon receipt of the written notice, the parties shall have at least three business days to respond in writing. In that response, the Respondent shall have the right to admit or deny the allegations, and to set forth a defense with facts, witnesses, and supporting materials. A Complainant shall have the right to respond to and supplement the notice. Throughout the Sexual Misconduct process the Complainant and the Respondent shall have the right to present witnesses and other inculpatory and exculpatory evidence.

3. If the Respondent admits responsibility, the process may proceed to the sanctioning phase or may be informally resolved, if appropriate.

4. An investigator shall conduct a thorough investigation and should retain written notes and/or obtain written or recorded statements from each interview. The investigator shall also keep a record of any party's proffered witnesses not interviewed, along with a brief, written explanation of why the witnesses were not interviewed.

5. An investigator shall not access, consider, disclose, or otherwise use a party's records made or maintained by a physician, psychiatrist, psychologist, or other recognized professional made in connection with the party's treatment unless the party has provided voluntary written consent. This also applies to information protected by recognized legal privilege.

6. The initial investigation report shall be provided to the Complainant, the Respondent, and a party's advisor (if applicable). This report should fairly summarize the relevant evidence gathered during the investigation and clearly indicate any resulting charges or alternatively, a determination of no charges. For purposes of this Policy, a charge is not a finding of responsibility.

7. The Complainant and the Respondent shall have at least 10 calendar days to review and respond in writing to the initial investigation report and directly related information gathered during the investigation. The investigator will review the Complainant's and the Respondent's written responses, if any, to determine whether further investigation or changes to the investigation report are necessary.

8. The final investigation report should be provided to the Complainant, the Respondent, and a party's advisor, if applicable, at least 10 calendar days prior to the Hearing. The final investigation report should also be provided to all Hearing Panel members for consideration during the adjudication process.

**Resolution/Hearing**

The Respondent and the Complainant, as parties to the matter, may have the option of selecting informal resolution as a possible resolution in certain cases where the parties agree, and it is deemed appropriate by the institution. Where a matter is not resolved through informal resolution a hearing shall be set. All Sexual Misconduct cases shall be heard by a panel of faculty and/or staff. All institutional participants in the Sexual Misconduct resolution process shall receive appropriate annual training as directed by the System Director or Coordinator and required by the Clery Act and Title IX.

In no case shall a hearing to resolve a Sexual Misconduct allegation take place before the investigation report has been finalized. The investigator may testify as a witness regarding the investigation and findings but shall otherwise have no part in the hearing process and shall not attempt to otherwise influence the proceedings outside of providing testimony during the hearing. All directly related evidence shall be available at the hearing for the parties and their advisors to reference during the hearing.

Relevant facts or evidence that were not known or knowable to the parties prior to the issuance of the final investigative report shall be admissible during the hearing. The institution will determine how the facts or evidence will be introduced. The admissibility of any facts or evidence known or knowable by the parties prior to the issuance of the final investigative report, and which were not submitted during the investigation, shall be determined by the institution in compliance with the obligation to provide both parties an equal opportunity to present and respond to witnesses and other evidence. Notice of the date, time, and location of the hearing as well as the selected hearing panel members shall be provided to the Complainant and the Respondent at least 10 calendar days prior to the hearing. Notice shall be provided via institution email to the parties' institution email. Parties may attend the hearing with their advisor.

Hearings shall be conducted in-person or via video conferencing technology. Where the institution determines that a party or witness is unable to be present in person due to extenuating circumstances, the institution may establish special procedures to permit that individual to provide testimony from a separate location. In doing so, the institution must determine whether there is a valid basis for the individual's unavailability, require that the individual properly sequester in a manner that ensures testimony has not been tainted, and make a determination that such arrangement will not unfairly disadvantage any party. Should it be reasonably believed that the individual presented tainted testimony, the hearing panel will disregard or discount the testimony. Parties may also request to provide testimony in a separate room from the opposing party, so long as no party is unfairly disadvantaged, and they have the opportunity to view the testimony remotely and submit follow-up questions.

At all times participants in the hearing process, including parties, a party's advisor, and institution officials, are expected to act in a manner that promotes dignity and decorum throughout the hearing. Participants are expected to be respectful to others and follow procedural formalities outlined by this Policy and the institution. The institution reserves the right to remove any participant from the hearing environment if the participant refuses to adhere to the institution's established rules of decorum.

Each institution shall maintain documentation of the investigation and resolution process, which may include written findings of fact, transcripts, audio recordings, and/or video recordings. Any documentation shall be maintained for seven years.

Additionally, the following standards will apply to Title IX and Non-Title IX Sexual Misconduct hearings respectively:

**A. Title IX Hearings**

1. Where a party or a witness is unavailable, unable, or otherwise unwilling to participate in the hearing, including being subject to cross-examination, the hearing panel shall not rely on statements of that party or witness in reaching its determination regarding responsibility. The hearing panel shall not draw an adverse inference against the party or witness based solely on their absence from the hearing or refusal to subject to cross-examination.
2. The parties shall have the right to present witnesses and evidence at the hearing.
3. The parties shall have the right to confront any witness, including the other party, by having their advisor ask relevant questions directly to the witness. The Hearing Officer shall limit questions raised by the advisor when they are irrelevant to determining the veracity of the allegations against the Respondent(s). In any such event, the Hearing Officer shall err on the side of permitting all the raised questions and must document the reason for not permitting any particular questions to be raised.
4. Questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, shall be deemed irrelevant, unless such questions and evidence are offered to prove that someone other than the Respondent committed the alleged conduct or consent between the parties during the alleged incident.
5. The hearing panel shall not access, consider, disclose, or otherwise use a party's records made or maintained by a physician, psychiatrist, psychologist, or other recognized professional made in connection with the party's treatment unless the party has provided voluntary written consent. This also applies to information protected by recognized legal privilege.

6. Formal judicial rules of evidence do not apply to the resolution process and the standard of evidence shall be a preponderance of the evidence.

7. Following a hearing, the parties shall be simultaneously provided a written decision via institution email of the hearing outcome and any resulting sanctions or administrative actions. The decision must include the allegations, procedural steps taken through the investigation and resolution process, findings of facts supporting the determination(s), determination(s) regarding responsibility, and the evidence relied upon and rationale for any sanction or other administrative action. The institution shall also notify the parties of their right to appeal as outlined below.

**B. Non-Title IX Sexual Misconduct Hearings**

1. The parties shall have the right to present witnesses and evidence at the hearing. Witness testimony, if provided, shall pertain to knowledge and facts directly associated with the case being heard.

2. The parties shall have the right to confront any witnesses, including the other party, by submitting written questions to the Hearing Officer for consideration. Advisors may actively assist in drafting questions. The Hearing Officer shall ask the questions as written and will limit questions only if they are irrelevant to determining the veracity of the allegations against the Respondent(s). In any such event, the Hearing Officer shall err on the side of asking all submitted questions and must document the reason for not asking any particular questions.

3. Questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, shall be deemed irrelevant, unless such questions and evidence are offered to prove that someone other than the Respondent committed the alleged conduct or consent between the parties during the alleged incident.

4. The hearing panel shall not access, consider, disclose, or otherwise use a party's records made or maintained by a physician, psychiatrist, psychologist, or other recognized professional made in connection with the party's treatment unless the party has provided voluntary written consent. This also applies to information protected by recognized legal privilege.

5. Formal judicial rules of evidence do not apply to the resolution process and the standard of evidence shall be a preponderance of the evidence.

6. Following a hearing, the parties shall be simultaneously provided a written decision via institution email of the hearing outcome and any resulting sanctions or administrative actions. The decision must include the allegations, procedural steps taken through the investigation and resolution process, findings of facts supporting the determination(s), determination(s)

regarding responsibility, and the evidence relied upon and rationale for any sanction or other administrative action. The institution shall also notify the parties of their right to appeal, as outlined below.

# 4.6.5.5 Possible Sanctions

In determining the severity of sanctions or corrective actions the following should be considered: the frequency, severity, and/or nature of the offense; history of past conduct; an offender's willingness to accept responsibility; previous institutional response to similar conduct; strength of the evidence; and the wellbeing of the university community. The institution will determine sanctions and issue notice of the same, as outlined above.

The broad range of sanctions includes: expulsion; suspension for an identified time frame or until satisfaction of certain conditions or both; temporary or permanent separation of the parties (e.g., change in classes, reassignment of residence, no contact orders, limiting geography of where parties can go on campus) with additional sanctions for violating no-contact orders; required participation in sensitivity training/awareness education programs; required participation in alcohol and other drug awareness and abuse prevention programs; counseling or mentoring; volunteering/community service; loss of institutional privileges; delays in obtaining administrative services and benefits from the institution (e.g., holding transcripts, delaying registration, graduation, diplomas); additional academic requirements relating to scholarly work or research; financial restitution; or any other discretionary sanctions directly related to the violation or conduct.

For suspension and expulsion, the institution must articulate, in its written decision, the substantial evidence relied upon in determining that suspension or expulsion were appropriate. For purposes of this Policy substantial evidence means evidence that a reasonable person might accept to support the conclusion.

# 4.6.5.6 Appeals

Appeals may be made in any cases where sanctions are issued, even when such sanctions are held "in abeyance," such as probationary or expulsion. Where the sanction imposed includes a suspension or expulsion (even for one held in abeyance), the following appellate procedures must be provided.

The Respondent (and in cases involving sexual misconduct or other forms of discrimination and/or harassment, the Complainant) shall have the right to appeal the outcome on any of the following

grounds: (1) to consider new information, sufficient to alter the decision, or other relevant facts not brought out in the original hearing (or appeal), because such information was not known or knowable to the person appealing during the time of the hearing (or appeal); (2) to allege a procedural error within the hearing process that may have substantially impacted the fairness of the hearing (or appeal), including but not limited to whether any hearing questions were improperly excluded or whether the decision was tainted by a conflict of interest or bias by the Title IX Coordinator, Conduct Officer, investigator(s), decision makers(s); or (3) to allege that the finding was inconsistent with the weight of the information. The appeal must be made in writing, must set forth one or more of the bases outlined above, and must be submitted within five business days of the date of the final written decision. The appeal should be made to the institution's President or their designee.

The appeal shall be a review of the record only, and no new meeting with the Respondent or any Complainant is required. The President or their designee may affirm the original finding and sanction, affirm the original finding but issue a new sanction of greater or lesser severity, remand the case back to any lower decision maker to correct a procedural or factual defect, or reverse or dismiss the case if there was a procedural or factual defect that cannot be remedied by remand. The President or their designee's decision shall be simultaneously issued in writing to the parties within a reasonable time period. The President or their designee's decision shall be the final decision of the institution.

Should the Respondent or Complainant (where applicable) wish to appeal the final institutional decision, they may request review by the Board of Regents in accordance with the Board of Regents' Policy on Discretionary Review.

Appeals received after the designated deadlines above will not be considered unless the institution or Board of Regents has granted an extension prior to the deadline. If an appeal is not received by the deadline the last decision on the matter will become final.

# 4.6.5.7 Recusal/Challenge for Bias

Any party may challenge the participation of any institution official, employee or student panel member in the process on the grounds of personal bias by submitting a written statement to the institution's designee setting forth the basis for the challenge. The designee shall not be the same individual responsible for investigating or adjudicating the conduct allegation. The written challenge should be submitted within a reasonable time after the individual knows or reasonably should have known of the existence of the bias. The institution's designee will determine whether to sustain or deny the challenge and, if sustained, the replacement to be appointed.



# 6.26 Application for Discretionary Review

Any University System of Georgia (USG) student or employee aggrieved by a final decision of a USG institution may apply to the University System Office of Legal Affairs (USO Legal Affairs) for a review of the decision subject to the parameters set forth below. Review of the decision is not a matter of right, but is within the sound discretion of USO Legal Affairs. USO Legal Affairs may issue guidelines governing the process for review.

Applications from USG students are permitted for final institution decisions other than decisions on admissions (including program admissions), residency, student grades, and traffic citations, as the final decision on those matters rests with the President of the institution at which the appeal is heard. Applications from USG employees are limited to instances in which an employee is terminated, demoted, or otherwise disciplined in a manner that results in a loss of pay. Notwithstanding the foregoing, an application may be reviewed if (1) the record suggests that a miscarriage of justice might reasonably occur if the application is not reviewed; or, (2) the record suggests that the institutional decision, if not reviewed, might reasonably have detrimental and system-wide significance.

Each application for review shall be submitted in writing to USO Legal Affairs within 20 calendar days following the final institution decision. USO Legal Affairs may, in its discretion, deny the application for review or refer the application a Committee composed of the following USO administrators or a designee of each administrator: the chief legal officer, who shall serve as the Chair of the Committee; the chief

academic officer, the chief administrative officer, the chief human resources officer, the chief student affairs officer; and any other person or persons deemed appropriate by the Committee. Upon referral, the Committee shall review the application and take any action that it deems appropriate.

The decisions of the USO Legal Affairs and the Committee shall be final and binding for all purposes. There shall be no recourse to the Chancellor or the Board of Regents from such decision; provided, however, that the Board of Regents' Committee on Organization and Law retains the authority to make an exception to this policy in its discretion. USO Legal Affairs shall periodically report to the Committee on Organization and Law regarding applications for discretionary review filed and their dispositions.

Nothing in this policy shall be construed to extend to any party substantive or procedural rights not required by federal or state law or any expectation of employment, admission, or additional due process rights. This policy is not part of due process rights afforded to students or employees of the University System; any such rights have been fully afforded upon the final institution decision. The Board of Regents reserves the right to change this policy at any time and to make such changes effective retroactively to any pending application.