# IN THE UNITED STATES OF DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JOHN DOE,

                Plaintiff,

vs.

Civil Action No.: 120-cv-04022-SDG

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA, UNIVERSITY OF
GEORGIA, JERE WADE
MOREHEAD, INDIVIDUALLY AND
AS PRESIDENT UNIVERSITY OF
GEORGIA, UNIVERSITY OF
GEORGIA EQUAL OPPORTUNITY
OFFICE, ERYN JANYCE DAWKINS,
INDIVIDUALLY AND AS
DIRECTOR EQUAL OPPORTUNITY
OFFICE, UNIVERSITY OF GEORGIA
ATHLETIC ASSOCIATION, INC.,
UNIVERSITY OF GEORGIA,
EDWARD MCMILLIAN TATE,
INDIVIDUALLY AND AS VICE
CHANCELLOR OF LEGAL
AFFAIRS, UNIVERSITY OF
GEORGIA AND C. DEAN ALFORD,
P.E., INDIVIDUALLY AND AS
MEMBER OF BOARD OF REGENTS
OF THE UNIVERSITY SYSTEM OF
GEORGIA.

                Defendants.

## PLAINTIFF'S AMENDED RESPONSE AND BRIEF IN SUPPORT TO DEFENDANT UNIVERSITY OF GEORGIA ATHLETIC ASSOCIATION, INC. 'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, John Doe, (hereinafter "Plaintiff" or "Doe") submits this Response to Defendant, University of Georgia Athletic Association, Inc's, (hereinafter "UGAAA") Motion to Dismiss Plaintiff's First Amended Complaint.

### I.  Facts of Plaintiff's Case Satisfy Rule 10(a)

Plaintiff has received threats including death threats and harassment due to his involvement in the subject incident.  Plaintiff was contacted by the University of Georgia, (hereinafter "UGA"), campus security who advised due to the such threats Plaintiff would be assigned security.  They also advised they thought it was best for Plaintiff to leave campus.   Plaintiff continued to receive such threats.  See Exhibit A, Plaintiff's Affidavit reflecting such facts.  The Court noted in Santiago v. Bliss, 2012 IL 111792 that using a fictitious name is not sufficient in itself  to dismiss a case.

Defendant, Board of Regents of the University System of Georgia, (hereinafter "BOR") and the moving defendants note that  Carrizosa v. Chiquita

Brands Int'l Inc., 965 F.3d 1238, 1247 (11th Cir. 2020) holds an exception to Rule 10(a) and allows Plaintiff to proceed under a fictitious name based on several factors. This matter involves, including but not limited to, breach of Plaintiff's First Amendment rights by the Defendants. ECF 46, Para. 32-49. BOR acknowledge in its brief submitted on their behalf that the subject case satisfied one (1) of these factors, i.e. challenging a governmental activity. ECF 55 P8.

BOR and moving defendant further acknowledge that another factor to permit proceeding with a fictitious name is if "there is a threat of violence or physical harm". See Carrizosa v. Chiquita Brands Int'l Inc., 965 F. 3d 1238, 1247 (11th Cir. 2020). Carrizosa noted there are "exceptional cases" in which a plaintiff my face so great a "danger of physical harm" that the plaintiff's interest in access to the judicial system outweighs the public's interest in judicial openness. Id at 1246. In this case there are death threats to Plaintiff. Death threats and physical harm satisfy the threat of violence in this case. Plaintiff's Affidavit reveals death threats and continued threats. The moving defendants are aware of such threats as their records reflect same, i.e. UGA's campus security as well as the EOO's reports and records which reveal such threats. EOO's reports are attached as Exhibit B1, October 4, 2018 EOO Report at P5, Para. 5 and P6; and Exhibit B2, October 9, 2018 EOO Report at P6, Para. 6.

Plaintiff's Affidavit is also attached as Exhibit A. Such confirms the physical threats, including death threats that Plaintiff received while a student at UGA. Plaintiff was contacted by campus police and advised he needed campus security due to all the physical threats towards the Plaintiff. Plaintiff was advised by UGA campus security that he needed to leave UGA campus for his safety. Plaintiff's Affidavit reveals the threats are ongoing. See Plaintiff's Affidavit attached as Exhibit A.

## II.  Discovery is needed to determine UGAAA's Actions in the present case.

Plaintiff relies on the facts set forth in Point III of this brief to establish that Defendant Morehead was a dual agent for UGA and UGAAA at the time of the subject incident. President Morehead is the Chairman of UGAAA per Macon Telegraph Publishing Co., 256 Ga.443 (1986). Discovery is needed to determine whom Morehead was acting on behalf of when he made certain decisions regarding the sanctions of Plaintiff in this matter by UGA and UGAAA in releasing the Plaintiff from the baseball team.

## III. Plaintiff has stated a Section 1983 claim against UGAAA, Inc., for violation of his First Amendment Rights, Equal Protection and Due Process as UGAAA acted under color of law.

Defendant UGAAA has previously argued that it is an arm of the State of Georgia for constitutional purposes. See Bryant v. UGA et al., Court Order

Superior Court of Athens-Clarke County, State of Georgia, Civil Action No.:  SU-04-V-2347-S.  See Exhibit C.  Such Court Order further reveals the UGAAA urged the <u>Bryant</u> Court to rely on language from the recent federal court decision of <u>Braswell v. Board of Regents of the University System of Georgia, et. al,</u> No 1:04-CV-2583-TWT (2005); 369 F. Supp. 2d 1362 (2005), in which the Court defined the UGAAA as a predominantly public entity, ……and thus the <u>Braswell</u> case declares the UGAAA to be an arm of the state for purposes of civil rights claim under 42 USC 1983.

UGAAA activities in the present case satisfy state action by the following. UGAAA followed the instructions of University of Georgia (hereinafter "UGA") in releasing John Doe from the UGA Baseball Team for saying the N word, which is an expression of speech.  The operation of the intercollegiate athletic program at the University of Georgia is a legitimate function of the University and is the responsibility of the so-called "Institutional authority" at the University of Georgia. This makes sense as the President of UGA is the instructional authority responsible for controlling the intercollegiate athletic program.  The Athletic Association is the management too which the President of UGA uses to carry out his responsibilities to control the University's intercollegiate Athletic Program.  See <u>Macon</u>, <u>Supra.</u> Additionally John Doe was at UGAAA's office with UGAAA's Assistant Director, Darrice Griffin, when it released John Doe from UGA Baseball Team permanently,

pursuant to instructions from UGAAA Chairman and UGA President, Jere Morehead.

### First Amendment Rights

UGAAA state action involving the First Amendment involves the following. Clearly the UGA Baseball Coach, Coach Stricklin is an agent of UGA and UGAAA and was acting on behalf of UGA and UGAAA when he released, permanently John Doe from the baseball team for using the N word. Coach Stricklin is a UGA Baseball Coach of the University of Georgia Athletic Association, Inc., (ie UGAAA). The UGAAA website listed Coach Stricklin's name and picture as a staff member. The Athletic Association is the management too which the President of UGA uses to carry out his responsibilities to control the University's intercollegiate Athletic Program. See Macon, Supra.

As noted above, the operation of the intercollegiate athletic program at the University of Georgia is a legitimate function of the University and is the responsibility of the so-called "Institutional authority" at the University of Georgia. The President of UGA is the instructional authority responsible for controlling the intercollegiate athletic program. The Athletic Association is the management tool which the President of UGA uses to carry out his responsibilities to control the University's intercollegiate Athletic Program. See Macon, Supra.

Additionally John Doe was at UGAAA's office with UGAAA's Assistant Director, Darrice Griffin, when John Doe was released from UGA Baseball team permanently. While Coach Stricklin and Darrice Griffin, Assistant Director of UGAAA personally advised John Doe he was permanently being released from the UGA baseball team, it was on behalf of the UGAAA and UGA President Morehead's decision to release John Doe permanently from the base baseball team. The President of UGA is the instructional authority responsible for controlling the intercollegiate athletic program.  The Athletic Association is the management too which the President of UGA uses to carry out his responsibilities to control the University's intercollegiate Athletic Program.  See Macon, Supra.

Such action violated John Does' First Amendment right of Freedom of Speech.   The First and Fourteenth Amendments extend to the campus of public colleges and universities such as UGA.  See Widmar v. Vincent, 454 US 263, at 268 (1981) (noting that "[w]ith respect to persons entitled to be there, our cases leave no doubt that the First Amendment right of speech and association extend to the campuses of state universities"); *see also* Healy v. James, 408 U.S. 169, at 180 (1972).

It is settled law that a public university may not discipline a student for engaging in protected expression. The Supreme Court held such over four decades ago in Papish v. Board of Curators of the University of Missouri, 410 U.S. 667

(1973). While recognizing a state university's undoubted prerogative to enforce reasonable rules governing student conduct, as noted above it was noted that state colleges and universities are not enclaves immune from the sweep of the First Amendment. See Healy v. James, 408 U.S. 169 (1972).  Healy make it clear that the mere dissemination of ideas-no matter how offensive to good taste-on a state university campus may not shut off in the name alone of "conventions of decency."

The First Amendment protects even speech that some may, or even all, find *hateful*.  The Supreme Court reiterated this fundamental principle in Synder v. Phelps, 562 U.S. 443  (2011), noting:  "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and inflict great pain.  …. We cannot react to that pain by punishing the speaker.  As a nation we have chosen a different course-to protect even hurtful speech on public issues to ensure that we do not stifle public debate. The Court again reaffirmed this principle in Matal v. Tam, 137 U.S. (2017), holding unanimously that the perception that expression is "hateful" or that **it demeans on the basis of race**, ethnicity, gender, religion, age, disability, or any other similar ground" is not a sufficient basis on which to remove speech from the protection of the First Amendment.

If hateful speech also falls under a category of unprotected speed, such as threats or incitement to imminent lawless action, it will lose its constitutional protection. But John Doe's publicized expression did not constitute either of those

things. There were no threats or incitement to imminent lawless action. UGA has a video of the incident, which is mentioned in the EOO's report.  A police officer was at the scene, he made a report which is in a Defendant's possession.  The report confirms there was not any threats or incitement to imminent lawless action. If the Court needs such report or video to confirm there were no threats or incitement to imminent lawless action, discovery will be needed for Plaintiff to produce such police/security report.  Thus this matter would not be ripe for Motion to Dismiss.

Nor does John Does' expression, as some will argue, constitute discriminatory harassment. At the time of this event, John Doe was a student at UGA. Unlike a faculty member or administrator, students do not usually have the kind of power over other students that make harassment (rather than just hostility or unpleasantness) possible.  In order for student behavior to constitute actionable "hostile environment" harassment under the applicable legal standard provided by the Supreme Court in Davis v. Monroe County of Board of Education, 526 U.S. 629 (1999), it must be unwelcome, discriminatory on the basis of gender or another protected status, and so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." *By definition, this would prevent a reasonable person from receiving his or her education.*  In a July 28, 2003, "Dear Colleague" letter

sent to all college and university presidents, the Office for Civil Rights of the U.S. Department of Education, which is tasked with enforcing anti-discrimination law, made clear that harassment *"must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive."*

Plaintiff's public statement regarding race made on UGA campus in Athens, Georgia was constitutional protected speech protected by the First Amendment of the Constitution. Plaintiff 's intent and context were in a positive manner and support of a person. *Plaintiff was rooting for Justin Fields, a quarterback to be played in the football game.* When Plaintiff learned his statement was viewed negatively, he stopped and apologized. Defendants and its agents actions were taken in retaliation for Plaintiff's exercise of its First Amendment freedoms. Defendant stated reasons for sanctions against Plaintiff by Defendants and its agents were pretextual and had no rational basis, being wholly contradicted by the view of the video and Plaintiff posed no threat to others at any time.

As the law is clearly established in this area, and as Defendants and its agents had (and have) fair warning that suspending and sanctioning a student from/by a public university in retaliation for the exercise of First Amendment freedoms is unconstitutional, Defendants are liable, for violating Plaintiff's First Amendment rights.

However John Doe was permanently released from an Athletic Team at UGA on or about October 3, 2018 by UGAAA for engaging in constitutional protected speech.  UGA via its EOO imposed additional sanctions, also for Plaintiff engaging in constitutional protected speech, on or about October 9, 2018, revised from prior issuance of October 4, 2018.  On October 4, 2018 John Doe was suspended for the remainder of the Fall 2018 semester with eligibility to enroll in the following semester, revised on October 9, 2018 to allow remote attendance of school with professors' permission, which was not possible for all classes John Doe was enrolled; prohibited from participating in any UGA Athletic units for the duration of his affiliation with UGA; prohibited from attending all UGA home events as a spectator until January 2020; and prohibited for the remainder of fall 2018 semester from entering the UGA campus without permission from EOO.

In conclusion, <u>Matal v. Tam</u>, 137 U.S. (2017) made it clear that the perception that expression is "hateful" or that **it demeans on the basis of race**, …." is not a sufficient basis on which to remove speech from the protection of the First Amendment. Thus John Doe's speech is protected by the First Amendment and UGAAA in its connection with UGA violated such right by permanently releasing John Doe from the team for saying a word involving race.

**Equal Protection**

Regarding state action involving Equal Protection, the Complaint sets forth many facts regarding UGAAA's state action involving John Doe. The First Amended Complaint sets forth additional facts regarding UGAAA's state actions and John Doe as well as other students/agents/athletes regarding alleged misbehavior/speech and the disciplining treatment they all received. UGAAA has sanctioned other athletes and students for alleged misbehavior.

Some of the specific facts of the First Amended Complaint regarding the other students/agents/athletes are as follows.

Jonathan Ledbetter, UGA Athlete had two (2) alcohol related arrests. The second arrest lead to a sanction of a 6-game suspension and being **temporarily excused** from the team so he could seek treatment. John Doe was never arrested. Athlete Ledbetter was not permanently released from an athletic team as John Does was. Nor was Ledbetter suspended from school as John Doe was.

Natrez Patrick, UGA Athlete's behavior violated UGA's marijuana-use policy twice with previous marijuana arrest. His sanction was four (4) game suspension. John Doe was not arrested. Athlete Patrick was not permanently released from a UGA Athletic Team as John Doe was. Nor was Patrick suspended from school as John Doe was.

Elijah Holyfield, UGA Athlete, was charged with misdemeanor, for marijuana possession. His sanction for misbehavior was a single game suspension.

Athlete Holyfield was not permanently released from an UGA Athletic Team as John Doe was. Nor Holyfield suspended from school as John Doe was.

Riley Ridley, UGA Athlete was disciplined for misbehavior of marijuana possession, a misdemeanor at the time. Ridley's sanction was a single game suspension. Ridley was not permanently released from an UGA Athletic Team as John Doe was. Nor was Ridley suspended from school as John Doe was.

Jayson Stanley, UGA Athlete was disciplined for misbehavior of marijuana possession at the time. His sanction was a one-game suspension. Athlete Stanley was not permanently released from an UGA Athletic Team as John Doe was. Nor was Stanley suspended from school as John Doe was.

Osei-Frimpong, (hereinafter "Frimpong") a student teacher, since 2016 made statements about race relations and were posted online. Those statements included "some white people may have to die for black communities to be made whole in this struggle to advance freedom". Critics argued the comments advocated violence against whites, threatened to withhold donations to the university and wanted Osei-Frimpong expelled. His supporters worried his speech rights were under attack. UGA never disciplined or issued any sanctions to Frimpong for such speech. (Frimpong's was accused for falsely filling out his graduate school application because he did not mention his prior studies at University of Chicago….. and was reviewed by The Office of Student Conduct

who did not find any violation of the school code of conduct).   See www.ajc.com/news/local-education/uga-grad-student, by Eric Stirgus, The Atlanta Journal-Constitution, May 8, 2019.   The EOO at UGA did not conduct an investigation and thus did not issue sanctions to Frimpong's regarding his statement about race.

 The state actions by UGAAA and UGA regarding sanctions for misbehaving or speech regarding race clearly reveals UGA and UGAAA have treated John Doe differently by issuing much more severe sanctions against John Doe.  None of the other athletes were permanently released from an UGA Athletic Team and the majority of them were disciplined for crimes which John Doe did not commit.   Further regarding Frimpong speech and John Does', clearly both are regarding speech involving race and UGA did not investigate Frimpong's speech via EOO or discipline Frimpong but treated John Doe differently by releasing him permanently from the baseball team at UGA and suspending him from school, etc..

 Andrew Logan Lawrence,   (hereinafter "Lawrence") went to the EOO Office**, as a UGA student,** on three (3) separate occasions, with three (3) separate speech statements of Frimpong regarding the white race and asked to file a Complaint and for the EOO to open an investigation.   All of his requests were denied by the EOO.   Specifically, Lawrence advised, (See Lawrence Affidavit attached hereto as Ex. D).

1. Throughout the Fall 2018 semester, I met with the University of Georgia Equal Opportunity Office (hereinafter 'EOO') on three (3) separate occasions in order to provide their office with information related to an altercation that took place in the Miller Learning Center between myself and UGA Philosophy student teacher, Irami Osei-Frimpong.

2. Mr. Osei-Frimpong was invited to speak at a general body meeting of the UGA Young Democrats on September 12, 2018, and I attended as student journalist, who wished to ask Mr. Osei-Frimpong about a number of statements he had made about white students on various social networking sites, including, but not limited to, comparing white students to children living with autism, calling them white supremacists, and Chick-fil-A workers.

3. During the exchange, which was videoed, during the question and answer portion of the meeting, Mr. Osei-Frimpong stated that white people were "sociopaths," and told me to "shut my yap" when I attempted to ask for clarification on his statements. He then went on to indicate that "it was a strategy to pretend that all white people were individuals." The degree to which I was humiliated by Mr. Osei-Frimpong and the nearly fifty (50) student attendees for simply being white is immeasurable.

4. On September 14, 2018, Mr. Osei-Frimpong took to the UGA Young Democrats Facebook page, where he publicly stated that my urge to ask questions was a "tick," that I was "culturally deficient," and that I should apologize because I was "sucking up so much air in the room." He continued to teach courses throughout this time.

5. On September 19, 2018, Kieran Morrow, Associate Director of the EOO, who had caught wind of the altercation, contacted me via phone to schedule a time to meet and discuss the events that had transpired. Following the call, I provided her with a video of the altercation, via e-mail. I met with Miss Morrow on Wednesday, September 26, 2018. During this meeting, I provided her with a detailed account of the events that transpired. I was unable, at this time, to share the video of Mr. Osei-Frimpong's lecture, due to the file size, and was told that I could not file a formal complaint until she viewed the video of Mr. Osei-Frimpong's lecture.

6. After unsuccessful attempts to provide the EOO with video of Mr. Osei-Frimpong's lecture through e-mail or flash drive, I again met with Miss Morrow in October 2018, the specific date of which, I am uncertain, as the meeting was scheduled over the phone. During this meeting, Miss Morrow watched the video of Mr. Osei-Frimpong's lecture, on my

phone, and transcribed 2-3 pages of Mr. Osei-Frimpong's comments. I also pointed Miss Morrow in the direction of Mr. Osei-Frimpong's RateMyProfessor.com page, which displays two student reviews from earlier in 2018, where students indicated that Mr. Osei-Frimpong had discriminated against them for being white. One student wrote that Mr. Osei-Frimpong told her that, since she was a member of a sorority, she was "bound to end up hooked on Xanax and living in Peachtree City." Miss Morrow claimed that she could not accept these reviews and informed me that based upon what she had seen in the video of Mr. Osei-Frimpong's lecture, and the video of our altercation, I would not be allowed to file a formal complaint.

7. Following a November 21, 2018 article that I penned for my previous employer, *Campus Reform.org*, which highlighted Mr. Osei-Frimpong's suspension from Facebook for his comments, I again met with Miss Morrow, presenting her with a number of written statements published by Mr. Osei-Frimpong, which continually criticized white students. Again, the EOO denied my request to file a complaint against Mr. Osei-Frimpong, and I was told that the EOO would investigate his student course reviews at the end of the semester. This was the last time that I

heard from the EOO.  Andrew Lawrence's Affidavit is dated 18th day of February 2021.

The above facts clearly set forth facts of other student/agents/athletes being sanctioned/disciplined for much more serious behavior than John Doe and UGAAA's different treatment, much harsher of John Doe as compared to other students/agents/athletes.  Other student/agents/athletes were involved in crimes, John Does was not.  However no other athlete was permanently released from a UGA athletic team by UGAAA as John Doe was.  Additionally, Frimpong also made speech that involved race and he was treated very differently. Frimpong was not sanctioned at all.

## DUE PROCESS

The Complaint sets forth numerous state actions involving due process. Students facing temporary suspension from a public school have property and liberty interest that qualify for protection under the Due Process Clause.  See Goss v. Lopez, 419 U.S. 565 (1975).  Goss  recognizes education as a property interest which is protected by Due Process.  Education may not be taken away without adherence to minimum procedures required by that Clause.   Suspension could seriously damage a student's standing with their fellow pupils and their teachers as well as well as interfere with later educational and employment opportunities.  See Goss, ID. Due Process also forbids arbitrary deprivations of liberty. Where a

person's good name, reputation, honor or integrity is at stake because what the government is doing to him, Due Process must be had.  If these interests are at stake, a violation could seriously damage a student's standing with their fellow pupils and their teachers as well as well as interfere with later educational and employment opportunities.  See Goss, ID.

John Doe had a property in his education and liberty interest in his good name, reputation, honor or integrity requiring Due Process. John Doe never received notice or the opportunity to be heard of the investigation/hearing for his constitutional protected speech from Coach Stricklin of UGAAA or Darrice Griffin, Assistant Director of UGAAA prior to their September 30, 2018 and/or October 2018 meetings wherein an investigation of John Doe's speech conducted and he was permanently released from UGA Baseball Team. John Doe's liberty interest in good name, reputation, honor and integrity was damaged as the release affected and interfered with his later employment opportunities, including but not limited to being drafted/employed as a player/member of major professional sports league, resulting in loss of income in an amount to be shown later in discovery or trial.

In light of UGAAA, UGA and the Board of Regents of the University System of Georgia, (hereinafter "Board") and its agents' retaliatory actions and the injuries to Plaintiff arising therefrom, the State of Georgia's procedures will not

provide Plaintiff with adequate pre- or post-deprivation remedy to cure the erroneous deprivation of his property and liberty interests.

As the law is clearly established in this area, and as UGAAA had (and have) fair warning that their actions of denying Plaintiff's right to a public education and liberty rights, as well notice and a fair and open hearing prior to releasing him from an UGAAA Baseball Team was unconstitutional, UGAAA is liable for violating Plaintiff's rights protected by Fourteenth Amendment.

## Breach of Contract

## (and Due Process)

Regarding the Board's and UGA policies and provisions in the UGA student handbook and UGAAA student athletic handbook creating a binding agreement between the Defendants and each UGA student, John Doe paid to attend UGA an in response he was permitted to attend UGA but had to follow the UGA student handbook and UGAAA student athletic handbook.  John Doe had many activities he had to complete for his contract with UGAAA and UGA, including but not limited to appearing and performing at extensive practices, games and other required appearances.

Incorporated into this agreement is Defendants' obligation to follow the procedures they have established for student discipline and Freedom of Expression. Defendants, Dawkins, UGA, UGAAA and Morehead breached the student

handbook's provision by sanctioning John Doe for speech that is permitted by the Freedom of Expression.

The Equal Opportunity Office is part of the University of Georgia's Code of Conduct, which is part of the UGA student handbook.  Defendants failed to follow these binding procedures. *Specifically there is to be a 2 part process for the Investigation and Resolution/Hearing, an Investigator and Misconduct Panel or Hearing Officer.  Once the Investigator finalizes the investigation report, the Investigator is required to provide such report to the Misconduct Panel or Hearing Officer. Further the investigator may testify as a witness regarding the investigation and findings, BUT SHALL OTHERWISE HAVE NO PART IN THE HEARING PROCESS and shall not attempt to otherwise influence the proceedings outside of providing testimony during the hearing.* The actual language is…..

1. The final investigation report should be provided to the misconduct panel or hearing officer for consideration in adjudicating the charges brought against the Respondent. A copy shall also be provided to the respondent and Complainant (where applicable) before any hearing. The investigator may testify as a witness regarding the investigation and findings, but shall otherwise have no part in the hearing process and shall not attempt to otherwise influence the proceedings outside of providing testimony during the hearing.

Director Dawkins, was the Investigator and Misconduct Panel or Hearing Officer in the subject case.  This precluded the two (2) part and separate fact finder required provision.  This issue was addressed in the appeal to UGA President Morehead and the Board but they refused to follow their own rules an thus breached the contract with John Doe.  This violation added Dawkins issue of lack of impartiality as she had already stated to John Doe and his parents "I am personally offended by the statement".

The UGAAA student athlete handbook includes the following terms.

Above all, we recognize the University's obligation to the state of Georgia, and to the parents everywhere who send us their sons and daughters, to provide our students with a level of quality education which leads to recognized academic achievement, <u>contributing to their social development</u> and preparing them for meaningful lives and careers…. Releasing someone from an athletic team for a brief incident does not contribute to their social development.   Other colleges have experienced such behavior and were able to effectively handle the situation.  They simple responded by stating that they do not agree with the speech, its not unlawful.

**Integrity**

By their very nature, athletics involve <u>character development</u>; for this reason, especially, we must conduct ourselves with utmost integrity.  All of our programs,

and the activities on our behalf by alumni and friends, must be consistent with the policies of the University and the athletic bodies which govern us. We are to be at all times honest and forthright in our dealings with each other, the public and media.  UGAAA did not work with John Doe's character development in this matter. Nor was UGAAA consistent with its policy of the University regarding student/agent/athlete speech regarding race.

**PERSONAL DEVELOPMENT**

Our primary purpose is to promote the personal growth and physical well-being of our student athletes, to guide them to become in life the best they can be.  It is our abiding goal to foster the ideals, standards, and value systems which will enable them to grow spiritually, emotionally and intellectually, and to  attain degrees in their chosen fields of endeavor.  Unfortunately UGA or UGAAA did not do this with John Doe.

**LEADERSHIP**

Our goal is to maintain a model athletic program which other colleges and universities may wish to emulate.  Beyond this, we shall continue to pioneer and promote policies which will enhance the quality of intercollegiate athletes throughout America.  Dedication to the personal development of our student athletes…..these are the values which underlie our endeavors and the standards by

which we measure ourselves.  Unfortunately these were not the actions of UGAAA including its Chairman and President Morehead in this matter.

## Conclusion

UGAAA has acted under a color of law pursuant to **42 USC 1983** in the present matter as the operation of the intercollegiate athletic program at the University of Georgia is a legitimate function of the University and is the responsibility of the so-called "Institutional authority" at the University of Georgia. The President of UGA is the instructional authority responsible for controlling the intercollegiate athletic program.  The Athletic Association is the management too which the President of UGA uses to carry out his responsibilities to control the University's intercollegiate Athletic Program.  See Macon, Supra.  UGAAA further engaged in state action when it released permanently John Doe from an UGAAA team in violation of his constitutional rights. Further UGA breached its contract with the Plaintiff.

This 11th day of April 2021.

By:   s/Dorothy Spinelli
Dorothy Spinelli
Georgia Bar No. 622927
Attorney for Plaintiff

1105 Town Blvd, # 2506
Brookhaven, Georgia 30319
404-789-4635

E-mail: dorothyspinelliesq@gmail.com

**CERTIFICATE PURSUANT TO L.R 7.1D**

I hereby certify that this brief conforms to the requirements of L.R. 5.1C.

This brief is written in 14 point New Times Roman font.

This 11th day of April 2021.

> s/Dorothy Spinelli
> Dorothy Spinelli
> Attorney for Plaintiff
> Georgia Bar No.:  622927

1105 Town Blvd, # 2506
Brookhaven, Georgia 30319
404-789-4635
E-mail: dorothyspinelliesq@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have, on this day, served the foregoing pleading with

the Clerk of the Court using the CM/ECF system, which will automatically send

email notification of such filing to all attorneys of record.

This 11th  day of April 2021.

By: ___s/Dorothy Spinelli_____
Dorothy Spinelli
Georgia Bar No. 622927
*Attorney for Plaintiff*

1105 Town Blvd, # 2506
Brookhaven, Georgia 30319
404-789-4635
E-mail: dorothyspinelliesq@gmail.com